**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETS**
**BOSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | **24CR10022-1** |
| **VS.** | § § § | |
| **CHARLES UCHENNA NWADAVID** | § § § | |

## DEFENDANT CHARLES NWADAVID'S SENTENCING MEMORANDUM

Defendant Charles Uchenna Nwadavid, through undersigned counsel, respectfully submits this memorandum to assist the Court in determining a just and appropriate sentence under 18 U.S.C. § 3553(a). Although the advisory guideline range is 78 to 97 months, pursuant to a plea agreement the parties agree that a sentence between 12 months and a day and 30 months is appropriate.

For the reasons set forth below, and in light of Mr. Nwadavid's extraordinary rehabilitation, his family circumstances, his deep remorse, and the strong support from his family, employees, and community, the defense respectfully asks this Court to impose a sentence of 12 months and a day imprisonment. Such a sentence would align with sentences in similarly situated cases to Mr. Nwadavid's and is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

## FACTUAL BACKGROUND

*Charles Biography*

Charles is a 35-year-old Nigerian national, born on April 14, 1990, in Lagos, Nigeria. He is the eldest child of Angela and the late Charles Nwadavid Sr. During his childhood, he endured poverty with periods without food or stable housing. Despite these hardships, his parents emphasized education, and Charles ultimately earned a bachelor's degree in Accounting from the University of Abuja in 2015. He

1

has also achieved a certificate program in Construction Project Management through Columbia University in 2023.

After college, Charles built two businesses—Chavid Properties Limited and Chavid Property Management—which employed 45 people at its peak.[1] He has been recognized with entrepreneurial awards and is widely respected as a business leader and mentor in his native Nigeria.  He is consistently asked to speak on panels and to other aspiring business people in Nigeria.

As a family man, Charles is married to Chioma, a media entrepreneur, and together they are raising two young sons, ages four and two.  In a letter to the Court, Charles' father in law speaks of how well Charles has treated his daughter and has grown to be a son to him.  Further, his father-in-law calls him "a truly good man" whose growth and accountability show that "the man who stands before you today is not the man who made those mistakes."

As the person who knows him best, Charles' wife, Chioma describes him as a husband and father for the Court:

> Charles is a man of quiet strength, deep wisdom, and unwavering devotion. He is the calm in every storm, not only for me but also for our two young boys. He leads our home with a God-first philosophy that influences everything he does. I have seen him teach our boys to be kind, respectful, emotionally aware, and spiritually grounded, not just with words but through daily example, like when we do morning devotions and pray together as a family before bed, reading bedtime stories that blend the "kids Bible" with other stories. He also sometimes takes our first son to work, his sites, or meetings. Our son is always eager to spend time with his father, who he admires as a role model. Charles is present for school activities like Father's Day celebrations, International Day, and other events. He is raising them to be men of character, just as he strives to be every day.
>
> Charles is also a remarkable husband, patient, supportive, and tender. He carries burdens most would fold under, yet he shows up with grace and gentleness. When I falter, he steadies me.

---

[1] With his arrest, the business has downsized to approximately 10 employees.

When I win, he celebrates like it's his victory. His love is quiet but strong, the kind that makes a house a home. He steadily drives me to be the best version of myself, pushing me with love to never become complacent, as a wife, mother, or businesswoman. He is my greatest cheerleader, even when I don't believe in myself.

Charles is also a devoted son to his recently widowed mother, Angela and the eldest brother to his younger siblings. Charles' mother describes him as a rock who helped her deal with the recent death of her husband and Charles' father. As the eldest sibling, Charles has been the leader and protector of his family. Each of his younger siblings speak to the paternal role that Charles served in their lives. His sister, Blessing, tells the Court of the sacrificial love that Charles has displayed on her behalf:

> Uche, as we fondly call him, is a man with a big, giving heart. He has always been sacrificial, and not just for show. I remember vividly when I was scheduled for ovarian cyst surgery. I was terrified, not just because of the procedure itself, but because we didn't have the money to cover the hospital bills. Without hesitation, Charles sold the only car he owned, his sole means of transportation for his real estate work, just to make sure I got the treatment and post-op care I needed. That act of love still brings tears to my eyes to this day. It wasn't about the money. It was about the way he made me feel: safe, protected, and deeply loved.

Charles' work as a businessman is best described by his sister, Chisom, who also works with him in his business:

> I saw firsthand how he applied [his determination to solve problems] to his work. He often talked about wanting to help solve Nigeria's housing problem, especially by providing affordable homes for people who would otherwise struggle to find decent housing. But beyond the talk, I saw it in the way he worked. The quality of houses he builds is exceptional, and people always comment on it. He insists on using the best materials, even when it reduces profit. I have heard many people say that his houses stand out because of how well built they are. He does not compromise on standards. Even his workers know that with Charles, they must do things right. That speaks to his integrity. In his mind, the people who live in those houses deserve the best, and he makes sure they get it. Charles's impact also goes beyond our family.
>
> Over the years, he has been recognized for his contributions to society, especially in the entrepreneurial space. As a CEO, he is committed to leadership that uplifts people and creates opportunities. He has received awards for his leadership  and

3

the value he brings to others, and those who know him outside our family speak about him with the same respect. He is someone who brings value wherever he is.

The Court also has received other letters from the people who know Charles best: his family, friends, and workers. Collectively, these letters paint a consistent picture of a man of faith, humility, and extraordinary devotion to his family and community. His mother-in-law, Patience, highlights his consistent support for charitable initiatives through the VOICE Foundation and pleads for mercy so he can return to his sons, "who miss their father the most." These letters are not mere platitudes; they reflect a man who, outside the context of this case, is a husband, father, employer, and role model. They also demonstrate that his rehabilitation is real, not aspirational.

The instant offense stems from conduct in 2016-2019 when Charles was a younger man. He became involved in assisting criminals in transferring funds derived from a romance fraud scheme. His activities stemmed from a bleak period in his life when he succumbed to peer pressure amongst financial difficulties in his life. Charles has accepted full responsibility and is deeply remorseful for his actions. He has expressed this remorse to his family and friends. Charles' remorse is more than mere words. Long before any investigation, Charles chose to step away from the conduct and disassociate from the individuals involved, reflecting genuine remorse.

Since he withdrew from this criminal activity in 2019, Charles has completely transformed his life. He has built businesses, created jobs, supported charitable work, and become a pillar of his family and community.

## **ARGUMENT**

As this Court is fully aware, the advisory Guideline sentence here is only a "starting point" and "initial benchmark" for this Court to consider and is not binding. *Gall v. United States*, 552 U.S. 38, 39 (2007). The Supreme Court has made clear that this Court has wide discretion, after consideration of the

4

factors set forth in 18 U.S.C. § 3553, to vary downward from the Guidelines.

In determining a fair and just sentence, several considerations weigh strongly in favor of a downward variance to 12 months and a day. Charles's history and personal characteristics reflect resilience and devotion to his family and community. His extraordinary post-offense rehabilitation demonstrates that he is no longer the man who engaged in wrongdoing years ago. Charles' voluntarily cessation of his criminal conduct long before law enforcement intervention, confirms his genuine rehabilitation. A 12 months and a day sentence fully satisfies the goals of sentencing. A longer term would be counterproductive to the goals of § 3553.

## A. Charles's History and Characteristics Support a Downward Variance

Charles's life reflects resilience, hard work, and devotion to others. He rose from extreme poverty to become a college graduate, business owner, and provider for dozens of employees. His leadership and mentorship are recognized by his staff and peers.

He is a devoted husband and father. His sons are at a critical developmental stage; a lengthy separation would inflict disproportionate harm on them and on his wife, who already bears the strain of his incarceration. He is also the emotional anchor for his recently widowed mother.

This is not a man defined by criminality. This is a man who made grave mistakes years ago, who has since rebuilt himself, and whose character today is affirmed by those closest to him.

## B. Post-Offense Rehabilitation & Voluntary Cessation of Criminal Activity Warrants Leniency

The Supreme Court has recognized post-offense rehabilitation as a valid basis for a downward variance. *Pepper v. United States*, 562 U.S. 476 (2011). Here, Charles's rehabilitation is extraordinary. He voluntarily terminated his involvement in this criminal activity in 2019. In the six years since, he has

5

built a thriving business, created jobs, supported charitable causes, and maintained a strong, faith-centered family. His remorse is evident in his acceptance of responsibility and in his daily life. **Charles has also chosen to face the consequences of his actions here in United States criminal court, instead of reaping the benefits of the magistrate court's release order and heading straight to immigration and deportation without the prosecution.**

Another critical factor supporting 12 months and a day as a sentence is that Charles voluntarily ceased his involvement in the fraudulent conduct well before any law enforcement investigation came to light. **His decision to walk away from the criminal activity in 2019, without the pressure of impending investigation or prosecution, is a compelling demonstration of his capacity for self-correction and moral judgment.**

This voluntary withdrawal shows that Charles recognized the wrongfulness of his actions and made a conscious decision to change course. Unlike many defendants who continue criminal conduct until apprehension, Charles's case stands out because his rehabilitation began before any legal consequences forced his hand. This decision is powerful evidence that he no longer poses a risk of reoffending, that his remorse is genuine, and that his current law-abiding life is not a product of circumstance but of deliberate choice.

The Court can and should weigh this voluntary cessation as a strong mitigating factor. It demonstrates that Charles has already achieved what the law seeks to encourage: the abandonment of criminal conduct and the pursuit of a constructive, responsible life. A 12 months and a day sentence appropriately reflects this reality while still providing adequate punishment.

**C. A 12 months and a day Sentence Satisfies the Goals of Sentencing**

Sentencing Charles to 12 months and a day imprisonment would also promote the goals of

sentencing.  Charles's arrest and prosecution—widely reported in Nigeria—have already sent a powerful message that the United States Government will prosecute wrongdoers long after their criminal activities have ceased.  The Government has already achieved its goals of deterrence as others have seen that even a pillar of the community will be prosecuted for youthful misconduct and mistakes. Additional prison time beyond 12 months and a day does not enhance deterrence but only prolongs the separation from his family and employees.  A 30-month sentence would jeopardize the businesses, destabilize his young family, and undermine the very rehabilitation he has worked so hard to achieve. It would also deprive his community in Nigeria of a leader who has demonstrated the ability to uplift others.

The 12 months and a day requested sentence is sufficient but not greater than necessary to promote the goals for just punishment and rehabilitation.  A year in federal custody is a serious punishment, especially for a first-time offender with a family and a thriving business thousands of miles away. Additional incarceration offers no further benefit. The Bureau of Prisons faces chronic overcrowding, with limited programming and opportunities. For an educated, entrepreneurial man like Charles, prison offers no rehabilitative value.  In this moment, Charles has a greater need for mercy and a period of quiet within which he can reflect upon his own actions, reestablish a connection with his family and its values, and reemerge again as a productive (if humbled) member of society.

Additionally, Charles' status as a non-American citizen also warrants a lesser sentence than the 30 months.  First, while in BOP, Charles will be imprisoned under circumstances far more onerous than an equally culpable citizen.[2]  He will not be eligible for certain classes and will not have a possibility of early release into a halfway house.  Second, after he completes his term of incarceration in BOP, Charles will

---

[2] Solely because of his immigration status, Mr. Nwadavid will not be permitted to serve his time at a Federal Prison Camp. Rather, he will be imprisoned in an institution far more restrictive and hazardous than required.

not be released back to freedom but will instead be sent to further incarceration in ICE custody as he awaits deportation proceedings, This incarceration would be for an uncertain time period for which he would not be credited and would be under harsher conditions than he will face in BOP or pretrial detention.

Finally, a sentence of one year and one day for Mr. Nwadavid would be consistent with sentences imposed on similarly situated defendants who laundered proceeds from romance and other fraud schemes targeting U.S. citizens. In *United States v. Amiegbe*, 21-cr-10339-IT, Judge Talwani imposed 6 months' imprisonment plus 3 months' home confinement for a participant whose "role in the scheme was to open bank accounts using fake passports and receive [nearly $830,000 in] fraud proceeds into those account" before "transfer[ing] the fraud proceeds to his co-conspirators." Dkt. 72 at 1.[3]  In *United States v. Aikorogie*, Dkt. 19-cr-10085-RWZ, Judge Zobel imposed a 1 year and 1 day sentence on a defendant who "open[ed] bank accounts using fake identity documents, quickly withdr[ew] funds deposited by unwitting victims and transfer[ed] the money to co-conspirators." Dkt. 56 at 1.[4]  Likewise, in *United States v. Montrage*, Dkt. 22-cr-00617-JPO (SDNY), Judge Oetken imposed a 1 year and 1 day on a Ghanaian social-media influencer who, as the government described, "launder[ed] more than two million dollars [from approximately 40 American victims] over the course of six years" for a Ghana-based criminal enterprise that defrauded Americans "predominantly [through] romance scams." Dkt. 41 at 4.[5] A one year and a day sentence for Mr. Nwadavid would thus align with sentences imposed in this District and elsewhere.

## CONCLUSION

Charles Uchenna Nwadavid is not the same man who, from 2016-2019, engaged in

---

[3] See also https://www.justice.gov/usao-ma/pr/dorchester-man-sentenced-role-online-scams.
[4] See also https://www.justice.gov/usao-ma/pr/lynn-man-sentenced-romance-fraud-scam.
[5] See also https://www.justice.gov/usao-sdny/pr/prominent-ghanaian-influencer-sentenced-one-year-prison- receiving-romance-scam.

wrongdoing. He has transformed himself into a respected entrepreneur, devoted husband and father, and source of stability for his family and community.  A 12 months and a day sentence will hold him accountable, promote respect for the law, and serve as adequate deterrence, while also recognizing his rehabilitation and the unique hardships faced by his family.

Respectfully submitted,

/s/ Dimitri Dube
Dimitri Dube
State Bar No. 24068944
1825 Market Center Boulevard
Suite 500
Dallas, TX 75201
972.975.2010 fax
dd601@nyu.edu

/s/ Martin G. Weinberg
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

/s/Maksim Nemtsev
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
max@mnpc.law

ATTORNEYS FOR DEFENDANT

9

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that Defendant served this sentencing memorandum upon the United

States Probation Office and the Government by filing through the electronic case filing system.

/s/ Dimitri Dube

Dimitri Dube
